**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| David Carroll, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Nutrien Ltd; Nutrien Ag Solutions; CF Industries Holdings, Inc.; Koch Inc., f/k/a Koch Industries, LLC; Koch Ag & Energy Solutions, LLC; Koch Fertilizer Wever, LLC; Koch Fertilizer, LLC; Koch Agronomic Services, LLC; Yara International ASA; Yara North America, Inc.; and The Mosaic Co.,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

INTRODUCTION ....... 1
JURISDICTION AND VENUE ....... 2
PARTIES ....... 5
A. PLAINTIFF ....... 5
B. DEFENDANTS ....... 5
1. Nutrien Defendants ....... 5
2. CF Industries ....... 6
3. Koch Defendants ....... 6
4. Yara Defendants ....... 8
5. Mosaic Defendants ....... 9
AGENTS AND CO-CONSPIRATORS ....... 9
FACTUAL ALLEGATIONS ....... 11
A. Background on the NPK Fertilizers ....... 11
B. NPK Fertilizers Market Structure ....... 14
C. Defendants' Anticompetitive Conduct Caused Unprecedented Anticompetitive Price Increases for NPK Fertilizers ....... 15
D. Government Investigation into the Fertilizer Industry ....... 17
E. The Structure and Characteristics of the NPK Fertilizer Market Render the Conspiracy Economically Plausible ....... 19
1. The Fertilizer Industry is Highly Concentrated ....... 19
2. NPK Fertilizers Are a Substitutable Commodity Product, Which Encourages Collusion ....... 21
3. The NPK Fertilizers Market is Characterized by Inelastic Demand ....... 21
4. Defendants Had Numerous Opportunities to Collude ....... 22
5. There Are High Barriers to Entry in the NPK Fertilizer Industry ....... 25
6. The NPK Fertilizer Market Features a Fragmented Buyer Base ....... 25
7. The Fertilizer Industry Has a History of Antitrust Violations ....... 26
CLASS ACTION ALLEGATIONS ....... 27
DEFENDANTS ARE ENGAGED IN A CONTINUING ANTITRUST VIOLATION ....... 30
PLAINTIFF DID NOT DISCOVER, NOR COULD HAVE DISCOVERED THROUGH REASONABLE DILIGENCE THE CLAIMS IN THIS LAWSUIT EARLIER ....... 31
DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY ....... 31

ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT ........................................ 33
CLAIMS FOR RELIEF ........................................ 34
Violation of the Sherman Act, 15 U.S.C. § 1, 3 Conspiracy Restraining Trade ........................................ 34
PRAYER FOR RELIEF ........................................ 36
DEMAND FOR JURY TRIAL ........................................ 37

Plaintiff David Carroll brings this action on behalf of himself, and all others similarly situated to recover damages and obtain injunctive relief against Defendants for violations of: (i) the antitrust laws of the United States; and (ii) the antitrust and consumer protection laws of the states set forth herein. Plaintiff alleges as follows based on personal knowledge as to himself, and on information and belief as to all others.

## INTRODUCTION

1. Nutrien Ag Solutions; CF Industries Holdings, Inc.; Koch Agronomic Services, LLC; Yara International ASA; The Mosaic Company; and Canpotex Ltd. (collectively, "Defendants") are among the largest producers and sellers of nitrogen, phosphate and potassium (potash) fertilizers (individual and collectively, "NPK Fertilizers") in the United States.

2. Starting as early as January 1, 2021, and continuing to the present ("Class Period"), Defendants and their co-conspirators conspired to fix, raise, maintain, and stabilize the price of NPK Fertilizers in the United States. Defendants implemented and executed their conspiracy by increasing the price of NPK Fertilizers by over 65%, leveraging a temporary spike in input costs to justify permanent industry-wide price increases, and utilizing other available means to exploit their collective market power and artificially increase prices of NPK Fertilizers.

3. Not only has the rise in fertilizer prices caused injury to farmers and downstream purchasers, it also led to triple-digit profit increases for fertilizer manufacturers in 2022 according to news articles, filings with the U.S. Securities and Exchange Commission, and information available on Nutrien's website.

4. The sharp increase in profits reaped by Defendants in 2022 was far disproportionate to increased production costs. According to one source, Nutrien's cost of goods sold increased 24% that year while its profits rose 142%; CF Industries saw its costs rise 28% while profits

increased 212%; and Mosaic's cost of sales increased 46% while profits were up 120%.[1]

5. The price spike from 2021 to 2022 represents a significant break in pricing patterns from at least 2015 to 2020,[2] a shift consistent with price hikes imposed by an industry cartel.

6. "They make excuses for price gouging," said Joe Maxwell, president of Farm Action and former Lieutenant Governor of Missouri. "They have blamed high natural gas prices. They blamed hurricanes in Louisiana and Florida, and they blamed COVID. … The truth is that they're exhibiting monopolistic practices within the marketplace."[3]

7. Defendants' wrongful and anticompetitive actions had the intended purpose and effect of artificially fixing, raising, maintaining, and stabilizing the price of NPK Fertilizers to Plaintiff and members of the Class (as defined herein). As a direct result of Defendants' concerted pricing and supply side decision making, NPK Fertilizer prices in the United States have been artificially inflated since at least January 1, 2021, causing Plaintiff and members of the Class to pay more for NPK Fertilizers than they would have but for Defendants' collusive conduct.

8. On behalf of a proposed class of thousands of individuals and entities nationwide, Plaintiff brings this class action to put an end to Defendants' illegal scheme, to recover damages, and to restore competition in the NPK Fertilizer marketplace.

## JURISDICTION AND VENUE

9. Plaintiff brings this antitrust class action pursuant to Sections 4 and 16 of the

---

[1] Noah Zahn, *Fertilizer Companies Cash in While Farmers Struggle,* https://projects.wuft.org/priceofplenty/profit/the-cost-of-growth-fertilizer-companies-cash-in-while-farmers-and-communities-struggle/ (accessed April 8, 2026).

[2] *Producer Price Index by Industry: Fertilizer Manufacturing*, Federal Reserve of St. Louis, (updated Feb. 27, 2026), https://fred.stlouisfed.org/series/PCU3253132531 (accessed March 31, 2026).

[3] Emily Kestel, *Farmers Endured A Rough Year, But Fertilizer Companies Cashed In*, https://investigatemidwest.org/2022/12/22/farmers-endured-a-rough-year-but-fertilizer-companies-cashed-in/ (accessed April 8, 2026).

Clayton Act (15 U.S.C. §§ 15 and 26) to restrain Defendants' continuing violation and to recover treble damages and the costs of suit, including reasonable attorneys' fees for the injuries sustained by Plaintiff and members of the Class, and for such other relief afforded under the laws of the United States for violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

10. This Court has subject matter jurisdiction pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1333(d), 1337(a), and 1367.

11. This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and/or delivered substantial quantities of NPK Fertilizers throughout the United States, including this District; (c) had substantial contacts with the United States, including this District; and/or (d) engaged in an antitrust conspiracy that was directed at and had a direct, foreseeable, and intended effect of causing injury to the business or property of persons residing in, located in, or doing business throughout the United States, including this District.

12. This Court has personal jurisdiction over all Defendants pursuant to 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15. U.S.C. § 22, which authorizes nationwide service of process and confers personal jurisdiction over a defendant that has sufficient minimum contacts with the United States as a whole, thereby satisfying the Fifth Amendment's due process requirements. Exercising personal jurisdiction over a defendant is proper under the Fifth Amendment Due Process Clause when, as here, the defendant and the conduct at issue bear a meaningful relationship to the United States. Defendants have a meaningful relationship with the United States through their own or their subsidiaries' operations and sales of NPK Fertilizers throughout the United States. The United States and its courts, including this Court, have a clear interest in adjudicating anticompetitive conduct occurring in the United States that affects

domestic commerce, businesses, and consumers. Defendants are sophisticated and substantial organizations with United States facilities or subsidiaries that operate in this country, making it fair for them to face litigation in this District.

13. Alternatively, the Court has personal jurisdiction over Defendants because they purposefully directed their business activity toward this jurisdiction and had substantial contacts with this jurisdiction. Defendants purposefully placed price-fixed NPK Fertilizer into the stream of commerce throughout the United States, including in this District. Defendants purposefully availed themselves of the laws and protections of this state. Plaintiff's claim for relief arises from and relates to illegal acts committed by Defendants within this jurisdiction because Defendants imposed unlawful overcharges for NPK Fertilizers and caused antitrust injury within this jurisdiction. Defendants' antitrust conspiracy was and is directed at, and had and has the intended effect of causing injury to, persons residing in, located in, or doing business in the United States, including in this District. Defendants sell their products in the continuous and uninterrupted flow of interstate commerce, including in, into, and from this District.

14. Defendants' unlawful, anticompetitive conduct substantially affected interstate commerce throughout the United States, causing injury to Plaintiff and the geographically dispersed Class Members.

15. Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26 and 28 U.S.C. § 1391(b), (c) and (d), because one or more Defendants resided or transacted business in this District, is licensed to do business or is doing business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

16. The activities of the Defendants and all co-conspirators, as described herein, were

within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the interstate commerce of the United States.

17. No other forum would be more convenient for the parties and witnesses to litigate this case.

## PARTIES

### A. PLAINTIFF

18. Plaintiff David Carroll is a citizen of Florida. During the Class Period, David Carroll purchased NPK Fertilizer directly from one or more of the Defendants at artificially inflated prices. David Carroll suffered an antitrust injury as a direct result of the antitrust violations alleged in this Complaint. This Complaint refers to David Carroll as "**Plaintiff**."

### B. DEFENDANTS

#### 1. Nutrien Defendants

19. Defendant Nutrien Ltd. is a corporation organized under the laws of Saskatchewan, Canada, with its principal executive offices in Saskatoon, Saskatchewan. Nutrien is the resulting entity from the 2018 merger of Agrium and Potash Corporation of Saskatchewan.[4]

20. Defendant Nutrien Ag Solutions is a Delaware corporation with its principal executive offices in Loveland, Colorado, and it is a wholly owned subsidiary of Nutrien Ltd. Alternately or in addition, Nutrien Ag Solutions is Nutrien Ltd's global retail division. Nutrien Ag Solutions' LinkedIn page describes itself as "[o]perated by Nutrien Retail, Nutrien Ag Solutions is a unit of Nutrien Ltd., the world's largest agricultural inputs company."[5] On Nutrien Ag

---

[4] *Agrium*, Linkedin, https://www.linkedin.com/company/agrium (accessed March 31, 2026).

[5] *Nutrien Ag Solutions,* Linkedin, https://www.linkedin.com/company/nutrien-ag-solutions (accessed March 31, 2026).

Solution's LinkedIn page the company claims to have over 10,000 employees.

21. This Complaint refers to Nutrien Ltd. and Nutrien Ag Solutions collectively as "**Nutrien**."

### 2. CF Industries

22. Defendant CF Industries Holdings, Inc. is a Delaware corporation with its principal executive offices in Northbrook, Illinois. CF Industries is a publicly traded company, listed on the New York Stock Exchange (NYSE: CF). This Complaint refers to CF Industries Holdings, Inc. as "**CF Industries**."

### 3. Koch Defendants

23. Koch Inc. is a Kansas corporation with its headquarters in Wichita, Kansas. On August 29, 2024, Koch Industries, LLC, announced it would thereafter go by the name of Koch, [5] Inc.,[6] consistent with the Kansas Secretary of State's website records indicating a merger and "conversion" in July 2024. Therefore, Koch, Inc., is the surviving entity and successor of its merger with Koch Industries, LLC.

24. Koch Ag & Energy Solutions, LLC, is a Delaware limited liability company with its principal executive offices in Wichita, Kansas. Koch Ag & Energy Solutions, LLC, is an indirect wholly owned subsidiary of Koch Industries, Inc. Koch Ag & Energy Solutions, LLC offers fertilizer, agronomic, and other services to its customers.[7] A 2024 press release from this

---

[6] *See* Press Release, *Koch Ag & Energy Solutions Completes Acquisition of Wever, Iowa, Fertilizer Plant*, PR Newswire (Aug. 29, 2024), https://www.prnewswire.com/news-releases/koch-ag--energy-solutions-completes-acquisition-of-wever-iowa-fertilizer-plant-302234228.html (accessed March 31, 2026); *see also Koch Inc: Overview*, Global Data, https://www.globaldata.com/company-profile/koch-industries-inc/ (accessed March 31, 2026) ("Koch Inc. (Koch) previously Koch Industries, LLC is a diversified multinational corporation engaged in a wide range of industrial activities.").

[7] *Koch Ag & Energy Solutions,* Crunchbase, https://www.crunchbase.com/organization/koch-ag-energy-solutions (accessed March 31, 2026).

entity indicated it had invested $2 billion in North American fertilizer production facilities, and was spending another $3.6 billion to acquire its new plant in Wever, Iowa.[8]

25. Koch Fertilizer Wever, LLC, is a Delaware limited liability company with its principal executive office in Wichita, Kansas. On August 29, 2024, Koch Ag & Energy Solutions announced it acquired the Wever, Iowa fertilizer plant from OCI Global for $3.6 billion.[9] Therefore, Koch Fertilizer Wever, LLC is a wholly-owned subsidiary of Koch Ag & Energy Solutions, LLC.

26. Defendant Koch Fertilizer, LLC is a Kansas Domestic Limited Liability Company with its principal executive offices in Wichita, Kansas. Koch Fertilizer, LLC, are collectively one of the world's largest producers and marketers of fertilizers" with the ability "to manufacture, market and distribute more than 13 million metric tons of fertilizer products annually." Koch Fertilizer owns or has interests in fertilizer plants in the United States and Canada, has a global distribution system including state-of-the-art terminals in the United States, and sells fertilizers including ammonia, urea, UAN, phosphate, potash, and sulfur-based products.[10] Koch Fertilizer, LLC, and its affiliates "own or have interests in nitrogen fertilizer plants in the United States" and other locations.[11] Koch Fertilizer, LLC is a wholly-owned subsidiary of Koch Ag & Energy Solutions, LLC.[12]

---

[8] Press Release, *Koch Ag & Energy Solutions Completes Acquisition of Wever, Iowa, Fertilizer Plant*, *supra.*

[9] *Id.*

[10] *Koch Fertilizer, LLC*, Crunchbase, https://www.crunchbase.com/organization/koch-fertilizer-llc (accessed March 31, 2026).

[11] Press Release, *Koch Ag & Energy Solutions Completes Acquisition of Wever, Iowa, Fertilizer Plant, supra.*

[12] *See id.* ("Koch Ag & Energy Solutions, LLC and its subsidiaries, including Koch Fertilizer, Koch Agronomic Services, Koch Energy Services and Koch Methanol, are global

27. Defendant Koch Agronomic Services, LLC is a Delaware limited liability company with its principal executive offices in Wichita, Kansas. "Koch Agronomic Services, LLC and other subsidiaries of Koch Fertilizer, LLC have become one of the world's largest networks for manufacturing and marketing value-added fertilizer products."[13] Therefore, Koch Agronomic Services, LLC, is a wholly owned subsidiary of Koch Fertilizer, LLC.

28. This complaint refers to Koch Industries, LLC; Koch, Inc.; Koch Ag & Energy Solutions, LLC; Koch Fertilizer Wever, LLC; Koch Fertilizer, LLC; and Koch Agronomic Services, LLC collectively as "**Koch Defendants**."

### 4. Yara Defendants

29. Defendant Yara International ASA is incorporated in The Kingdom of Norway with its principal executive offices in Oslo, Norway. Yara International ASA is publicly traded, listed on the Oslo Stock Exchange (YAR:OL), and has registered American Depositary Receipts in the United States. Yara International ASA produces and markets fertilizers and related solutions and collected $13.9 billion in 2024 revenue.

30. Defendant Yara North America Inc. is a privately held Delaware corporation with its principal executive offices in Tampa, Florida. Yara North America, Inc. "manufactures fertilizers and agricultural chemicals and offers animal feeds, soluble fertilizers, and farm supplies."[14] A 2010 press release stated Yara International ASA had agreed to acquire Terra Industries, Inc. for approximately $4.1 billion and convert Terra Industries into its wholly-owned

---

providers of value-added solutions for the agriculture, energy, and chemical markets.").

[13] *Koch Agronomic Services, LLC*, Crunchbase, https://www.crunchbase.com/organization/koch-agronomic-services (accessed March 31, 2026).

[14] *Yara North America*, Crunchbase, https://www.crunchbase.com/organization/yara-north-america (accessed March 31, 2026).

subsidiary named Yara North America.[15] Zoominfo has estimated Yara North America's income at $72.5 million per year and reported its website is www.yara.us.[16]

29. This Complaint refers to Yara International ASA and Yara North America Inc. collectively as "**Yara**."

**5. Mosaic Defendants**

30. Defendant The Mosaic Co. (NYSE: MOS) is a Delaware corporation with its principal offices in Tampa, Florida. The Mosaic Co. is a vertically integrated business of crop nutrition including producing and selling phosphate and potash.[17] This Complaint refers to The Mosaic Co. as "**Mosaic**."

## AGENTS AND CO-CONSPIRATORS

31. Defendants' acts were performed by their respective officers, directors, agents, employees or representatives while actively engaged in the management, direction, control or transaction of Defendants' business affairs.

32. Various other persons, firms and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy. Defendants are jointly and severally liable for the acts of their Co-conspirators, whether or not the Co-conspirators are named as Defendants in this Complaint.

33. Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its officers, directors, agents, employees or

[15] Press Release, Terra Industries Inc. *Terra Industries to be Acquired by Yara International for US $41.10 per Share in Cash*, Securities and Exchange Commission Archives, https://www.sec.gov/Archives/edgar/data/722079/000095012310012769/c56322exv99w1.htm (accessed March 31, 2026).

[16] *Yara North America*, Zoominfo, https://www.zoominfo.com/c/yara-north-america-inc/1123348659 (accessed March 31, 2026).

representatives while they were actively engaged in the management, direction, control or transaction of the corporation's business or affair.

34. Each Defendant named herein acted as the agent or joint-venturer of or for the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

35. When Plaintiff refers to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiff is alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all the Defendant companies within that family. Defendants' conspiracy involved Defendants' reliance that other corporate families would act consistently with their agents' statements about prices and production. Because Defendants operate and market themselves as corporate families, individual participants in the conspiratorial acts did not often know or identify the corporate affiliations of themselves or their counterparts, nor did they recognize the technical distinction between the entities within a corporate family. Thus, all Defendant entities within the corporate families were active, knowing participants in the conspiracy to raise and maintain supra-competitive prices of NPK Fertilizers.

36. Canpotex Limited is a private joint venture owned by Nutrien Ltd. and Mosaic Canada Corp. Nutrition, LP (a wholly-owned subsidiary of Mosaic). Canpotex Limited maintains its principal executive offices in Saskatoon, Saskatchewan, Canada. In a 2020 letter to the United States Securities and Exchange Commission, Mosaic's Controller Lydia A. Burke explained that Canpotex Limited is a Saskatchewan export association owned by Mosaic and Nutrien. Each owner's relative economic interest in the joint venture "dictates the relative volumes of potash product" they sell to Canpotex. These ownership interests can be adjusted as the owners "add peaking capacities."

37. Canpotex's board of directors includes representatives of both Mosaic and Nutrien.18 Mosaic has explained that it does not consolidate Canpotex's accounting with its own accounting, but rather records its equity investment "using the equity method of accounting."19 Canpotex ships potash into the United States by rail and operates shipping terminals in Portland, Oregon and Thunder Bay, Ontario. This Complaint refers to Canpotex Limited as "Canpotex."

38. In a previous price-fixing case, the Seventh Circuit Court of Appeals noted the plaintiffs' claim that Canpotex facilitated that price-fixing arrangement by providing Mosaic, Agrium, and PCS with "access to one another's sensitive production and pricing information." *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 850 (7th Cir. 2012) (*en banc*), *cert. dismissed*, 570 U.S. 935 (2013).

39. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

## FACTUAL ALLEGATIONS

### A. Background on the NPK Fertilizers

40. Phosphate fertilizers originate from mined phosphate rock that is chemically processed into plant-available forms.

41. Potash fertilizers are derived from mineral deposits formed over geological time and extracted through mining or brine recovery.

42. There are three primary nutrients for fertilizer: nitrogen, phosphorus, and potassium, which correspond to the chemical symbols N, P, and K. In 2024, Nitrogen accounted for approximately 59 percent of worldwide fertilizer nutrient consumption.[17] The production of

[17] *Fertilizer Industry Worldwide – Statistics & Facts*, Statista (Dec. 17, 2025), https://www.statista.com/topics/8956/fertilizer-industry-worldwide/#topicOverview (accessed March 31, 2026).

nitrogen fertilizer begins by combining atmospheric nitrogen with hydrogen derived from natural gas under high pressure and temperature to create ammonia. The ammonia is then used to produce nitric acid, which is combined with ammonia to yield nitrate fertilizers such as ammonium nitrate. Ammonia may also be combined with liquid carbon dioxide to produce urea. These products can be further mixed with water to form urea ammonium nitrate solution.[18]

43. Phosphate fertilizers are produced from mined ores. The world's four largest phosphate-producing countries are China, Morocco, the United States, and Russia.[19] In the United States, phosphate is mined in Florida, North Carolina, Idaho, and Utah. Mosaic operates three phosphate mines in Florida, and Nutrien operates phosphate mines in North Carolina and Utah. To produce the fertilizer, the phosphate rock is primarily treated with sulfuric acid to create phosphoric acid, which is then either used in concentrated form or combined with ammonia to create various phosphate fertilizer products.[20]

44. Potassium-based fertilizers are commonly referred to as potash. Potassium chloride accounts for approximately 90% of the potassium used in world agriculture. Other widely used potassium products include potassium sulfate, potassium nitrate, and potassium-magnesium salts. Potassium-bearing minerals are mined from underground ore deposits, salt lakes, and brines, and

[18] *How Fertilizers are Made*, Fertilizers Europe, https://www.fertilizerseurope.com/fertilizers-in-europe/how-fertilizers-are-made/ (accessed March 31, 2026),

[19] Melissa Pistilli, *Top 10 Phosphate Countries by Production*, Investing News Network (Aug. 25, 2025), https://investingnews.com/daily/resource-investing/agriculture-investing/phosphate-investing/top-phosphate-countries-by-production/ (accessed March 31, 2026).

[20] *How Fertilizers are Made*, Fertilizers Europe, https://www.fertilizerseurope.com/fertilizers-in-europe/how-fertilizers-are-made/ (accessed March 31, 2026).

are then prepared and purified using dry and slurry processes.[21]

45. Each of the three primary nutrients serves a distinct function in plant growth, requires different raw material inputs, and involves separate chemical and industrial production processes. In 2024, the U.S. fertilizer market was valued at approximately $29 billion.[22]

46. The United States is one of the world's largest consumers of fertilizer nutrients, ranking among the top four fertilizer-consuming nations globally.[23] Fertilizer demand is expected to remain fairly stable in mature markets such as North America, where consumption patterns do not fluctuate significantly from year to year.[24]

47. Defendants are major producers of key fertilizer nutrients. For example, Nutrien is a leading producer of potash, and CF Industries is among the largest producers of ammonia, with Yara also a significant participant in global ammonia production.[25]

48. Defendants operate extensive production and distribution networks that enable them to supply fertilizer products to customers across key agricultural regions in the United States. For example, CF Industries maintains five manufacturing plants in the United States and

---

[21] *Manufacturing Process of Potassium Fertilizers*, Valco, https://www.valcogroup-valves.com/faq-2/potassium-fertilizers-manufacturing-process-of-potassium-fertilizers/ (accessed March 31, 2026).

[22] *U.S. Fertilizers Market Size, Share, Growth & Trends, 2033*, Market Data Forecast (Oct. 2025), https://www.marketdataforecast.com/market-reports/us-fertilizers-market (accessed March 31, 2026).

[23] Doris Dokua Sasu, *Global Consumption of Fertilizers 2023, by Country,* Statista (Dec. 10, 2025), https://www.statista.com/statistics/1287852/global-consumption-fertilizer-by-country/ (accessed March 31, 2026).

[24] *See Fertilizer Industry Worldwide – Statistics & Facts*, Statista (Dec. 17, 2025), https://www.statista.com/topics/8956/fertilizer-industry-worldwide/#topicOverview (accessed March 31, 2026).

[25] Doris Dokua Sasu, *Global Fertilizer Production 2005-2023, by Nutrient*, Statista (Dec. 15, 2025), https://www.statista.com/statistics/1290786/global-fertilizer-production-by-nutrient/ (accessed March 31, 2026)

approximately two dozen distribution facilities, and uses barges, rail, and trucking to move product from centralized production sites to customers.[26]

49. Mosaic operates phosphate mining operations in Florida, Brazil, and Peru, with processing facilities in Florida, Louisiana, and Brazil that convert raw phosphate rock into commercial fertilizer products. The company also produces potash through mining operations in Canada, the United States, and Brazil, and maintains distribution warehouses across numerous states.[27] Yara operates multiple production sites on the U.S. East Coast and in California, as well as joint ventures in the Eastern Midwest and on or near the Gulf Coast.[28]

50. These fertilizers are sold individually or blended in standardized formulations and are largely interchangeable across producers, making price competition the primary differentiating factor in the market.

**B. NPK Fertilizers Market Structure**

51. The U.S. market for NPK Fertilizers is highly concentrated. A small number of firms control the vast majority of production and distribution capacity. Significant capital requirements, economies of scale, control over raw material inputs, and regulatory barriers prevent meaningful entry by new competitors. This market structure is particularly susceptible to coordination and collusion.

52. Defendants also had numerous opportunities to communicate and align their

---

[26] Jim Vinoski, *To Get an Edge With a Commodity Product, Fertilizer Giant CF Industries Relies on Distribution*, Forbes (Feb. 8, 2019), https://www.forbes.com/sites/jimvinoski/2019/02/08/this-fertilizer-manufacturers-competitive-advantage-their-distribution-model/ (accessed March 31, 2026),

[27] The Mosaic Company, Annual Report (Form 10-K) at 2, 14 (2024).

[28] *Yara International ASA (YARIY) Analyst/Investor Day – Slideshow*, Seeking Alpha (Jan. 9, 2026), https://seekingalpha.com/article/4858275-yara-international-asa-yariy-analyst-investor-day-slideshow (accessed March 31, 2026).

strategies through joint ventures, trade associations, and recurring executive-level meetings. These forums enabled the exchange of competitively sensitive information and facilitated adherence to coordinated pricing and supply strategies.

**C. Defendants' Anticompetitive Conduct Caused Unprecedented Anticompetitive Price Increases for NPK Fertilizers**

53. From about 2015 to 2020, just before the start of the conspiracy alleged herein, NPK Fertilizer's price fluctuations appear transitory, consistent with a competitive market, as shown in the following graph of the Producer Price Index for fertilizer manufacturing.[29]




54. During the Class Period, prices for NPK Fertilizers rose sharply and remained elevated for extended periods. These elevated price increases largely persisted even as key input costs declined and demand softened, deviating from historical pricing patterns. This sustained increase represents a clear departure from the prior pattern, is consistent with coordinated, supra-

[29] *Producer Price Index by Industry: Fertilizer Manufacturing*, Federal Reserve of St. Louis, (updated Feb. 27, 2026), https://fred.stlouisfed.org/series/PCU3253132531 (accessed March 31, 2026).

competitive pricing, and is inconsistent with competitive market dynamics. [30]

55. As suggested by the graph, because of Defendants' price hikes, NPK Fertilizer prices increased substantially in 2021 and 2022 and have remained elevated above competitive levels.[31] In 2021, U.S. farmers paid over 60% more for fertilizers. Nitrogen fertilizer prices rose approximately 95%, and potash prices increased by more than 70%, adding an estimated $128,000 in costs per farm for feed grain operations in 2022.[32]

56. "The increase in fertilizer prices has probably been the number one issue" for farmers, said Nicholas Paulson, professor in agricultural economics at the University of Illinois at Urbana-Champaign.[33]

57. These price increases generated significant profits for Defendants that outpaced any asserted increases in their production costs. During the first nine months of 2022, Mosaic reported net earnings of approximately $842 million, reflecting a profit increase of 217% compared to the same period in the prior year. CF Industries reported more than $2.49 billion in net income over the same nine-month period, representing a 1,075% increase year-over-year.[34]

58. Defendants' substantial profit increases show that changes in input costs do not explain Defendants' price increases. For example, changes in natural gas price accounted for only

---

[30] *Producer Price Index by Industry: Fertilizer Manufacturing*, Federal Reserve of St. Louis, (updated Feb. 27, 2026), https://fred.stlouisfed.org/series/PCU3253132531 (accessed March 31, 2026).

[31] *Id.*

[32] Frank DeMatteo, *Justice Department Probes Fertilizer Giants for Possible Price Collusion*, Yahoo!finance (March 4, 2026), https://finance.yahoo.com/news/justice-department-probes-fertilizer-giants-192006014.html (accessed March 31, 2026);

[33] Monica Cordero, *Farmers Endured a Rough Year, but Fertilizer Companies Cashed In*, Investigate Midwest, https://investigatemidwest.org/2022/12/22/farmers-endured-a-rough-year-but-fertilizer-companies-cashed-in/ (accessed March 31, 2026).

[34] *Id.*

about 19% of the nitrogen price increase from April 2021 to April 2022.[35]

**D. Government Investigation into the Fertilizer Industry**

59. On October 28, 2025, Mark Mueller, President of the Iowa Corn Growers Association ("ICGA"), addressed a U.S. Senate Committee Hearing on Competition Issues in the Seed & Fertilizer Industries, stating that, "the massive increase in the cost of fertilizer is crushing corn growers in Iowa, and they aren't alone. Growers across the country are facing an impossible decision: buy fertilizer or stay solvent."[36] Mueller attributed the high fertilizer prices to two decades of unchecked consolidation in the U.S. Fertilizer industry, which left only a few major companies controlling each market segment.[37]

60. According to Mueller, the effects of this market concentration led to fertilizer costs that far outpaced the price farmers received for their corn.[38] For example, the amount of corn sales required to purchase one unit of monoammonium phosphate (a fertilizer that combines phosphorous and nitrogen) had increased from an average of 136 bushels over the last five year to 230 bushels today, increasing economic pressure on farmers as fertilizer prices escalate while crop revenues remain comparatively stagnant.[39]

---

[35] Bart L. Foscher, et al, *Concentration and Competition in the U.S; Fertilizer Industry,* Agricultural and Food Policy Center, Texas A&M University (March 2024), file:///C:/Users/daviscs/Downloads/BP-24-1_AFPC-Fertilizer-Markets-May-2024.pdf (accessed March 31, 2026).

[36] Testimony of Mark Mueller President of the Iowa Corn Growers Association, U.S. Senate Committee Judiciary Hearing on Competition Issues in the Seed & Fertilizer Industries (Oct. 28, 2025), available at https://www.grassley.senate.gov/imo/media/doc/mark_mueller_testimony_senate_judiciary_committee_submitted_version.pdf (accessed Mar. 31, 2026).

[37] *Id.*

[38] *Id.*

[39] *Id.*

61. In December 2025, President Trump issued an Executive Order directing the U.S. Attorney General and the Chairman of the Federal Trade Commission to each establish a Food Supply Chain Security Task Force within their respective agencies to aggressively investigate price-fixing and anti-competitive practices across the food sector.[40]

62. On January 21, 2026, United States Department of Agriculture Deputy Secretary, Stephen Vaden, held a videotaped conversation with the National Agricultural Law Center, in which he attributed high fertilizer prices to anticipative conduct, telling the audience that:

> Mosaic and Nutrien[] have a joint venture in Canada where they openly, their word[,] work together, my word, collude to control prices up there. That would be such a clear violation of the antitrust laws of the United States. They don't bring that joint venture officially down here in the United States, but what they've been able to manage to do through other means is achieving the same result, constraining supply and driving up the price that farmers pay.[41]

63. In February 2026, both the ICGA and the Texas Corn Producers Association sent separate letters to U.S. Attorney General Pam Bondi seeking information about what the U.S. Department of Justice ("DOJ") is doing to pursue possible antitrust actions against the fertilizer industry.[42] As reported by Progressive Farmer, the letters reflect farmers' growing frustrations over lower crop returns while fertilizer prices continue to remain high.[43]

64. On March 4, 2026, news broke that the DOJ Antitrust Division had opened a formal

---

[40] The White House, Fact Sheet: President Donald J. Trump Addresses Security Risks from Price Fixing and Anti-Competitive Behavior in the Food Supply Chain (Dec. 6, 2025), available at https://www.whitehouse.gov/fact-sheets/2025/12/fact-sheet-president-donald-j-trump-addressessecurity-risks-from-price-fixing-and-anti-competitive-behavior-in-the-food-supply-chain/ (accessed Mar. 31, 2026).

[41] A Conversation with USDA Deputy Secretary Stephen Vaden (Jan. 21, 2026), recording available at https://nationalaglawcenter.org/webinars/vaden/ (accessed Mar. 31, 2026).

[42] Progressive Farmer, Report: DOJ Looking at Fertilizer Cos. (Mar. 5, 2026), available at https://www.dtnpf.com/agriculture/web/ag/crops/article/2026/03/05/iowa-corn-growers-urge-dojpress?utm_source=chatgpt.com (accessed Mar. 31, 2025).

[43] *Id.*

antitrust investigation into the pricing practices of major Fertilizer producers to determine whether they colluded or coordinated to raise nitrogen, phosphate and potash fertilizer prices for U.S. farmers.[44] According to news reports, the investigation, being run by the Antitrust Division's Chicago Field Office, is looking at CF Industries, Koch Inc., Mosaic, Nutrien, and Yara International. Those companies are the dominant suppliers of fertilizer products in the United States.[45] Sources told reporters the government inquiry is examining whether coordinated pricing or supply decisions crossed the line into civil or criminal antitrust violations.[46]

65. Texas Corn Producers Association (TCPA) President Hagen Hunt applauded the news: "We are grateful to see this step forward," Hunt said. "Farmers across this country have been dealing with artificially inflated input costs for far too long, and an investigation will send a clear signal that those days may be numbered. Our farm families deserve a fair and competitive marketplace, and we are encouraged by the reports that the DOJ is working to deliver one."[47]

**E. The Structure and Characteristics of the NPK Fertilizer Market Render the Conspiracy Economically Plausible**

**1. <u>The Fertilizer Industry is Highly Concentrated</u>**

The Fertilizer industry in the United States has long been highly concentrated and with significant

---

[44] *E.g.,* https://finance.yahoo.com/news/justice-department-probes-fertilizer-giants-192006014.html; Bloomberg, DOJ Probes US Fertilizer Market for Possible Price Fixing (Mar. 4, 2026), available at https://www.bloomberg.com/news/articles/2026-03-04/doj-probes-us-fertilizer-market-forpossible-price-fixing?utm_source=chatgpt.com (accessed Mar. 31, 2026).

[45] *Id.*

[46] FarmProgress, DOJ probes U.S. fertilizer market for possible price fixing (Mar. 4, 2026), available at https://www.farmprogress.com/farm-business/doj-probes-u-s-fertilizer-market-forpossible-price-fixing (accessed Mar. 31, 2026).

[47] https://texascorn.org/doj-launches-investigation-into-fertilizer-price-fixing/#:~:text=The%20investigation%20is%20a%20significant,remained%20stubbornly%20and%20artificially%20high. (accessed Mar. 31, 2026).

consolidation dating back to the 1980s.[48] As a result, today each of the major nutrient industries is dominated by a single corporation: Mosaic reigns over the American phosphate market, CF Industries commands the nitrogen sector, and Nutrien has taken charge of the North American potash market along with Mosaic.[49] The number of firms in has decreased from 46 to 13 since the 1980s, with Defendants now controlling a substantial portion of the market.[50]

66. The following table shows the four-firm concentration ratio for the three NPK Fertilizers for the United States, North America, and the world.[51]

| **Four-Firm Concentration Ratio for Fertilizers by Geographic Scope** | | | |
|---|---|---|---|
| | United States | North America | World |
| Potash | 100% | 99% | 84% |
| Nitrogen | 77% | 77% | 13% |
| Phosphate | 100% | 100% | 25% |

67. Research indicates that market concentration levels (HHI) for phosphate (4,553) and potash (3,455) are well above the 2,500 threshold generally considered "highly concentrated."

68. The following table show the Herfindahl-Hirschman Index for the four fertilizers, again by geographical scope.[52]

[48] *See* Farm Action Fact Sheet: The Fertilizer Sector, available at https://farmaction.us/wpcontent/uploads/2024/09/Fertilizer_Farm-Action.pdf ("The fertilizer industry has a historical precedence of extreme consolidation…"). (accessed Mar. 31, 2026).

[49] *Id.*

[50] Nathan Beacom, Record Prices Give rise to Consolidation Concerns in the Fertilizer Industry(Sept. 23, 2022), available at https://ambrook.com/offrange/supply-chain/record-pricesconsolidation-concerns-fertilizer-industry-ukraine-nitrogen (accessed Mar. 31, 2026).

[51] Bart L. Foscher, et al., *Concentration and Competition in the U.S; Fertilizer Industry,* at 10 Agricultural and Food Policy Center, Texas A&M University (March 2024), file:///C:/Users/daviscs/Downloads/BP-24-1_AFPC-Fertilizer-Markets-May-2024.pdf (accessed March 31, 2026) (Table 3).

[52] *Id.* (Table 2).

| Herfindahl-Hirschman Index (HHI) For Fertilizers by Geographic Scope | | | |
|---|---|---|---|
| | United States | North America | World |
| Potash | 3,455 | 4,255 | 1,011 |
| Nitrogen | 2,382 | 2,242 | 368 |
| Phosphate | 4,553 | 4,533 | 152 |

69. This high market concentration paved the way for conspiracy, since Defendants only needed to agree with, and police, a small number of market participants for their price-fixing agreement to be successful. Moreover, their large market shares gave them the collective power to impose and sustain the price increases described herein.

**2. <u>NPK Fertilizers Are a Substitutable Commodity Product, Which Encourages Collusion</u>**

70. NPK Fertilizers are considered a homogeneous, commodity product. Nitrogen is nitrogen and phosphorus is phosphorus, despite the label on the package. Defendants' NPK Fertilizer products do not differ significantly in terms of quality, appearance, or use, rendering them functionally interchangeable.

71. When products are interchangeable, companies generally are forced to win business by competing on price. Thus, cartels are more likely to form between competitors selling interchangeable products as means to avoiding price-based competition and because cartel members can more easily monitor and detect defections from a price-fixing agreement.

**3. <u>The NPK Fertilizers Market is Characterized by Inelastic Demand</u>**

72. Demand is considered inelastic when a seller can increase prices without suffering a substantial reduction in demand. Demand inelasticity allows for collusion, because it enables producers to raise their prices collectively without triggering substitution to alternative products that could make the conspiratorial prices unprofitable.

73. Most fertilizer prices are found to co-move positively in *low*, *medium*, and *high*

*extreme* scenarios. For example, the positive synchronization of *diammonium phosphate* and *triple superphosphate* prices, both serving as end-use phosphate fertilizers, suggests the difficulty for farmers to substitute one for the other in the face of extreme market conditions. This fact, together with the oligopolistic structure of the fertilizer market and the inelastic behavior of fertilizers puts particular pressure on agricultural markets, increasing their vulnerability and, hence, threatening food security.[53]Pricing for NPK Fertilizers is highly inelastic, in part, because there are no adequate substitutes.

**4. Defendants Had Numerous Opportunities to Collude**

74. Opportunities for collusion facilitate price-fixing by providing cartelists with otherwise legitimate-appearing opportunities to discuss prices and production. Communications among competitors can therefore provide evidence of price-fixing. The fertilizer industry features a significant joint venture and trade association meetings that provide Defendants with opportunities to collude.

75. As noted above in this Complaint's section on Agents and Co-Conspirators, Nutrien and Mosaic and their affiliates together own and operate their Canpotex joint venture. Nutrien and Mosaic representatives sit together on Canpotex's board of directors. Canpotex buys potash products from Mosaic and Nutrien, and reduces its net earnings to a breakeven level by deducting costs from what it pays these companies to buy products. Each owner's relative economic ownership interest in Canpotex "dictates the relative volumes of potash product sold to Canpotex" and "can be adjusted as the shareholders add peaking capacities due to capital expansions."[71] The directors at least approve Canpotex's operating budget.[72] Canpotex necessarily involves the

[53] Oranuch Wongpiyabovorn and Chad Hart, *Examining the Factors of Fertilizer Pricing*, https://onlinelibrary.wiley.com/doi/epdf/10.1002/jaa2.133, (accessed Mar. 31, 2026).

Mosaic and Nutrien representatives in discussing fertilizer prices and production and their own changes in production and production capacity. Canpotex provides ample opportunities to exchange other pricing information and to discuss and agree upon prices and production restrictions to maintain or increase prices. The Seventh Circuit previously noted the claim that Canpotex facilitated the earlier price-fixing arrangement by providing its then-owners Mosaic and Agrium with "access to one another's sensitive production and pricing information." *Minn-Chem, Inc.*, 683 F.3d at 850.

76. As noted in this Complaint's Government Investigation section, in January 2026, Deputy Agriculture Secretary Stephen Vaden essentially accused Mosaic and Nutrien of colluding through Canpotex.[54]

77. Canpotex and its parent companies can move the United States potash market. Canpotex exports over 13 million tonnes of potash per year,[55] acting as Mosaic's and Nutrien's exporter. From 2019 through 2023, the United States imported over 90% of its apparent potash use, making its potash market dependent on imports. From 2019 to 2022, Canada provided 77% of the potash that the United States imported.[56] Given Canadian potash's influence on the United States market, its major decisions about potash routing, timing, and allocation can affect the amount of comparable potash available for sale into or affecting the United States market.

78. The industry also gives Defendants opportunities to collude through various trade association events in the fertilizer industry. These opportunities include conventions and meetings

[54] Ryan Hanrahan, *USDA's Vaden Accuses Nutrien, Mosaic of Fertilizer Price Collusion, supra.*

[55] *Our Markets*, Canpotex, https://www.canpotex.com/what-we-do/our-markets/ (accessed March 31, 2026).

[56] *Potash*, https://pubs.usgs.gov/periodicals/mcs2024/mcs2024-potash.pdf (accessed March 31, 2026).

of boards of directors on which the executives jointly sit.

79. For example, all six Defendants are active members of the International Fertilizer Association ("IFA"), a global fertilizer association, headquartered in Paris, France. Bruce Bohn (CF Industries), Bruce Bodine (The Mosaic Company), Kenneth Seitz (Nutrien), and Svein Tore Holsether (Yara International ASA), are also members of IFA's Board. IFA sponsors a number of recurring in-person trade events including the IFA Annual Conference and the Cultivating Tomorrow Conference.

80. Similarly, CF Industries, Inc, Koch Fertilizer, LLC., The Mosaic Company, Nutrien, and Yara North America, Inc., are all members and Board members, of The Fertilizer Institute ("TFI"), a national fertilizer industry organization headquartered in Arlington, Virginia. In addition to offering exclusive members-only "market volatility information and resources," TFI also sponsors a number of trade events, including an Annual Business Conference, Agronomy Conference and Expo, World Fertilizer Conference, and Market & Logistics Conference.

81. All six Defendants are members of Fertilizer Canada ("FC"), a Canadian fertilizer industry organization headquartered in Ottawa, Ontario. CF Industries, Inc., Koch Fertilizer Canada, ULC, The Mosaic Company, Nutrien, and Yara North America, Inc. are members of the Board of FC.24 FC is an organization representing producers, manufacturers, wholesale and retail distributors of nitrogen, phosphate, potash and sulfur fertilizers.

82. Nutrien Ltd., The Mosaic Company, and Koch Sulfur Products Company L.L.C., are all members and Board members of The Sulfur Institute ("TSI"), a global association for sulfur and sulfuric acid professionals, based in Washington, D.C. TSI sponsors a number of in person trade events each year, such as the Sulphur World Symposium and its annual Executive Committee Meeting.

83. Both David Bilby (CF Industries) and Shawn McGreevy (Koch Fertilizer LLC), are Board members of the Fertilizer Industry Round Table ("FIRT"), a fertilizer trade group. Gary Vogen (Yara North America, Inc.), previously served as a Board member of FIRT. FIRT hosts an annual meeting, in partnership with TFI.

84. Both Koch Agronomic Services, LLC and The Mosaic Company are members of the Agricultural Retail Association ("ARA"), an industry trade group based in Arlington, Virginia. Additionally, Nathan Packer (Nutrien Ag Solutions) and Bob Ness (The Mosaic Company), are members of the Board of ARA. ARA hosts a number of recurring in-person events, including the Annual ARA Conference and Expo, in addition to semi-annual in-person meetings of ARA committees.

**5. There Are High Barriers to Entry in the NPK Fertilizer Industry**

85. Under normal circumstances, a collusive agreement amongst horizontal competitors would attract new market entrants. However, high barriers to entry in the NPK Fertilizers industry have prevented new firms from entering the market.

86. In particular, any new entrant would need to invest significant start-up capital on plants, specialized equipment, labor, infrastructure for distribution, and regulatory compliance.

87. As a result of the high barriers to entry, new competitors were prevented from responding to the supra-competitive prices caused by Defendants' price-fixing agreement by entering the market, thus facilitating Defendants' conspiracy.

**6. The NPK Fertilizer Market Features a Fragmented Buyer Base**

88. Having numerous, dispersed buyers for a product can facilitate seller coordination by limiting the ability of any individual purchaser to discipline prices or monitor seller conduct.

89. The purchasers of NPK fertilizers are highly fragmented. According to the 2022 Census of Agriculture, the United States had approximately 1.9 million farms with an average size

of 463 acres, marking the first time since before the Civil War that the number of farms fell below two million.[57]

90. In addition to individual farming operations, purchasers also include agricultural retailers, distributors, and cooperatives, among others. This fragmented buyer base limits the ability of purchasers to exert meaningful competitive pressure on Defendants' pricing.

**7. <u>The Fertilizer Industry Has a History of Antitrust Violations</u>**

91. A prior history of collusion in an industry supports the plausibility of a current price-fixing conspiracy because it reflects structural conditions that are conducive to coordination and shows that market participants have previously taken advantage of those conditions.

92. The fertilizer industry has such a history. In *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845 (7th Cir. 2012) (en banc), civil plaintiffs alleged that defendants - including Mosaic and the predecessor companies of Nutrien (Agrium and Potash Corporation of Saskatchewan) - conspired to restrain global potash output in order to inflate prices. The Seventh Circuit, sitting *en banc*, found that the allegations sufficed "to support a plausible story of concerted action." *Id*. at 860. The defendants in that case ultimately paid multimillion-dollar settlements to both direct and indirect purchaser classes.[58]

93. The Canpotex joint venture played a central role in the earlier litigation. The Seventh Circuit noted the plaintiffs' allegation that Canpotex facilitated the price-fixing arrangement by providing its owner companies with access to one another's sensitive production

---

[57] Andrew Keller, *2022 Census of Agriculture: Number of Farms Falls Below 2 million*, USDA Economic Research Service, (Feb. 28, 2024), https://www.ers.usda.gov/data-products/charts-of-note/chart-detail?chartId=108629 (accessed March 31, 2026).

[58] *See, e.g.*, Press Release, The Mosaic Company Announces Settlement of Potash Antitrust Litigation (Jan. 30, 2013), https://www.prnewswire.com/news-releases/the-mosaic-company-announces-settlement-of-potash-antitrust-litigation-189020521.html (accessed March 31, 2026).

and pricing information. *Minn-Chem, Inc.*, 683 F.3d at 850. In a 2020 letter to the Securities and Exchange Commission, Mosaic's Controller explained that the owners' relative economic interests in the Canpotex joint venture dictate the relative volumes of potash product each sells to the entity, and that those ownership interests can be adjusted when the owners add production capacities. Representatives of both Mosaic and Nutrien serve on Canpotex's board of directors, which at a minimum approves the entity's operating budget.[59]

## CLASS ACTION ALLEGATIONS

94. Plaintiff brings this action for damages and injunctive relief on behalf of himself and a Class of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), with the class initially defined to include (the "Class"):

> All persons or entities that purchased any NPK Fertilizer directly from one or more Defendants within the United States from January 1, 2021 until the present (the "Class Period").

95. Specifically excluded from the Class are Defendants; the officers, directors, or employees of any Defendant; any entity in which any Defendant has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant. Also excluded from the Class is any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, any juror assigned to this action, any business majority-owned by any such person, and any Co-conspirator identified in this action.

96. Plaintiff reserves the right to modify or amend the definition of the Class before the Court determines whether certification is appropriate.

[59] Letter, Lydia A. Burke, Mosaic, to Securities and Exchange Commission regarding Mosaic Form 10-K for Fiscal Year Ended December 31, 2019 (Aug. 17, 2020), https://www.sec.gov/Archives/edgar/data/1285785/000124378620000111/filename1.htm (accessed March 18, 2026).

97. **Numerosity**: Plaintiff does not know the exact number of Class Members[60] because such information presently is under exclusive control of Defendants. Plaintiff believes that due to the nature of the trade and commerce involved, there are thousands of Class Members geographically dispersed throughout the United States, such that joinder of all Class Members is impracticable.

98. **Typicality**: Plaintiff's claims are typical of the claims of the Class because Plaintiff purchased NPK Fertilizers directly from one or more of the Defendants, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

99. **Common Questions Predominate**: There are questions of law and fact common to the Class, including, but not limited to:

A. Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of NPK Fertilizers sold in interstate commerce in the United States;

B. The duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

C. Whether the alleged conspiracy violated the antitrust laws;

D. Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and Class Members;

E. The effect of Defendants' alleged conspiracy on the prices of NPK Fertilizers sold in the United States and applicable states listed in the State

[60] Class Members refers to the members of the Class as defined in this Complaint.

Law Class during the Class Period;

F. Whether Plaintiff and other members of the Class are entitled to, among other things, injunctive relief and if so, the nature and extent of such injunctive relief; and

G. The appropriate class-wide measure of damages.

These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

100. **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class who indirectly purchased NPK Fertilizers and Plaintiff has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class.

101. **Superiority**: A class action is superior to other available methods for the fair and efficient adjudication of this controversy since individual joinder of all damaged Class Members is impractical. Prosecution as a class action will eliminate the possibility of duplicative litigation. The relatively small damages suffered by individual Class Members compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for Class Members to seek redress for the violations of law herein alleged. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, a class action presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court.

102. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

103. Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

**DEFENDANTS ARE ENGAGED IN A CONTINUING ANTITRUST VIOLATION**

104. During the Class Period, Defendants continued to sell NPK Fertilizers to Plaintiff and other putative Class Members at prices artificially inflated by Defendants' price-fixing conspiracy.

105. Due to ever-fluctuating economic and market conditions, Defendants needed to continually renew, monitor, and adjust their price-fixing agreement. This resulted in multiple coordinated price increases throughout the Class Period, as described above. Moreover, each of these activities resulted in new, overt acts that injured Plaintiff and the putative Class, thus creating a new cause of action for purposes of the statute of limitations.

106. In addition, each sale of NPK Fertilizers made to Plaintiff or the putative Class that was artificially inflated as a result of the conspiracy also constituted a new, overt act that restarted the statute of limitations.

107. These new, overt acts—which would not have occurred had the conspiracy disbanded—were not merely reaffirmations of Defendants' previous acts. Rather, they were new and independent acts that were necessary to renew and refine Defendants' agreement, resulting in new and accumulating injury to Plaintiff and the other members of the proposed Class.

108. As a result, Defendants engaged in a continuing antitrust violation throughout the Class Period and, regardless of any tolling- and estoppel-related arguments, Plaintiff's claims and those of the putative Class are not time barred.

**PLAINTIFF DID NOT DISCOVER, NOR COULD HAVE DISCOVERED THROUGH REASONABLE DILIGENCE THE CLAIMS IN THIS LAWSUIT EARLIER**

109. Plaintiff's antitrust claims are governed by the discovery rule—*i.e.*, the statute of limitations does not begin to run until discovery of the injury from the alleged violation. Prior to the investigation and analysis performed by and for Plaintiff's counsel, Plaintiff and putative Class Members did not know—nor could they have known through the exercise of reasonable diligence—that the prices they were paying for NPK Fertilizers were artificially inflated and causing them injury.

110. Furthermore, even assuming that Plaintiff could have somehow discovered its injury sooner (which it could not), it could not have determined that such injury was the result of Defendants' price-fixing conspiracy. As discussed below, not only did Defendants never reveal the existence of their price-fixing conspiracy, they actively concealed its existence by, among other things, blaming price increases on rising raw material, packaging, labor, and energy costs, as well as environmental conditions such as heatwaves and droughts. Plaintiff did not know and had no reasonable way of knowing that these statements were false and, in fact, Plaintiff was being injured by Defendants' price-fixing conspiracy.

111. For these reasons, both the discovery rule and the doctrine of equitable tolling dictate that all of Plaintiff's claims and those of the putative Class, going back to the beginning of the Class Period, are timely.

**DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY**

112. Throughout the Class Period, each of the Defendants effectively, affirmatively, and fraudulently concealed their conspiracy from Plaintiff and putative Class Members.

113. In engaging in the price increases and other conspiratorial acts set forth in this Complaint, the Defendants pointed to and utilized false and misleading pretexts, including publicly

attributing the price increases to external market forces beyond their control. As set forth herein, and based on Plaintiff's analysis, such pretexts cannot explain or justify the prices increases set forth herein and were intended to conceal Defendants' conspiracy.

114. Throughout the Class Period, Defendants reinforced the appearance of a competitive market through statements in their public filings with the Securities and Exchange Commission. For example, Mosaic repeatedly told investors that the markets for their products are "highly competitive."[61] Nutrien similarly described the market for its products as "highly competitive" and "based largely on price, reliability and deliverability."[62] These representations communicated to investors that NPK Fertilizer prices were the product of ordinary, competitive market forces.

115. At the same time, Defendants publicly and repeatedly attributed their price increases to common external forces beyond their control. CF Industries, for instance, attributed price increases across each of its product lines to "strong global demand" and "decreased global supply availability as higher global energy costs drove lower global operating rates."[63] CF Industries later added that "geopolitical factors disrupted the global fertilizer supply chain" as a further justification,[64] and its 2022 Annual Report similarly attributed record-high nitrogen prices

---

[61] The Mosaic Company, Annual Report (Form 10-K) for fiscal year ended December 31, 2021, at 2.

[62] Nutrien Ltd., Annual Information Form, Year Ended December 31, 2021, at 15.

[63] CF Industries Holdings, Inc., Press Release, Second Quarter and First Half 2021 Results (Aug. 9, 2021), https://www.sec.gov/Archives/edgar/data/1324404/000132440421000020/cf-08092021_ex991xearnings.htm (accessed March 31, 2026).

[64] CF Industries Holdings, Inc., Press Release, First Quarter 2022 Results (May 4, 2022), https://www.sec.gov/Archives/edgar/data/1324404/000132440422000014/cf-05042022_ex991xearnings.htm (accessed March 31, 2026)

to increased energy costs in Europe and Asia and to Russia's invasion of Ukraine.[65]

116. Defendants' reliance on these external explanations provided a common narrative for simultaneous price increases and discouraged scrutiny into whether those increases were the result of coordination rather than independent decision-making.

117. As a result, Plaintiff and putative Class Members neither knew, nor in the exercise of due diligence could they have reasonably known, of the facts that form the basis for their claims. Thus, even if the discovery rule or equitable tolling were somehow inapplicable, Defendants should nonetheless be estopped from raising any statute of limitations defense.

## ANTICOMPETITIVE EFFECTS OF DEFENDANTS' CONDUCT

118. Defendants' anticompetitive conduct had the following effects, among others:

A. Price competition has been restrained or eliminated with respect to NPK Fertilizers;

B. The prices of NPK Fertilizers have been fixed, raised, stabilized, or maintained at artificially inflated levels;

C. Indirect purchasers of NPK Fertilizers have been deprived of free and open competition; and

D. Indirect purchasers of NPK Fertilizers paid artificially inflated prices.

119. The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of NPK Fertilizers. As a direct and foreseeable result, Plaintiff and the Class paid supra-competitive prices for NPK Fertilizers during the Class Period.

---

65 CF Industries Holdings, Inc., 2022 Annual Report, https://www.cfindustries.com/globalassets/cf-industries/media/documents/reports/annual-reports/2022-cf-industries-annual-report.pdf (accessed March 31, 2026).

120. By reason of the alleged violations of the antitrust laws, Plaintiff and the Class sustained injury to their businesses or property, having paid higher prices for NPK Fertilizers than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages.

121. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CLAIMS FOR RELIEF

### COUNT ONE
**Violation of the Sherman Act, 15 U.S.C. § 1, 3**
**Conspiracy Restraining Trade**
**(Against All Defendants)**

122. Plaintiff incorporates by reference the allegations in the preceding paragraphs.

123. Beginning as early as January 1, 2021, the exact date being unknown to Plaintiff and exclusively within the knowledge of Defendants, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement to unlawfully and unreasonably restrain trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 by artificially reducing or eliminating competition for the pricing of NPK Fertilizers.

124. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

125. Defendants' anticompetitive acts had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for NPK Fertilizers throughout the United States.

126. The conspiratorial acts and combinations have caused unreasonable restraints in the market for NPK Fertilizers.

127. As a result of Defendants' unlawful conduct, Plaintiff and the members of the

Nationwide Class have been harmed by being forced to pay inflated, supra-competitive prices for NPK Fertilizers.

128. In formulating and carrying out the alleged agreement, understanding and conspiracy, Defendants and all of their co-conspirators did those things that they combined and conspired to do, including but not limited to the acts, practices, and course of conduct set forth in this Complaint. Defendants' conspiracy had the following effects, among others:

A. Price competition in the market for NPK Fertilizers has been restrained, suppressed, and/or eliminated in the United States;

B. Prices for NPK Fertilizers sold by Defendants, their divisions, subsidiaries, and affiliates, and all of their co-conspirators have been fixed, raised, stabilized, and maintained at artificially high, non-competitive levels throughout the United States; and

C. Plaintiff and members of the Nationwide Class have been deprived of the benefits of free and open competition in the purchase of NPK Fertilizers.

129. Defendants took all the actions alleged in this Complaint with the knowledge and intended effect that their actions would proximately cause the price of NPK Fertilizers to be higher than it would be but for Defendants' conduct.

130. As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Nationwide Class have been injured in their business or property and will continue to be injured in their business and property by paying more for NPK Fertilizers than they would have paid and will pay in the absence of the conspiracy.

131. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment on his behalf and on behalf of the Class, by adjudging and decreeing as follows:

1) Determining that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

2) Appointing Plaintiff as the Class Representative and its counsel of record as Class Counsel, and direct that at a practicable time notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class;

3) Adjudging and decreeing that the acts of the Defendants are illegal and unlawful, including that the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators are a per se violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3);

4) Awarding damages to Plaintiff and the Class for Defendants' violations of the Sherman Act (15 U.S.C. §§ 1, 3);

5) Entering judgment against Defendants, jointly and severally, and in favor of Plaintiff and members of the Class for treble the amount of damages sustained by Plaintiff and the Class as allowed by law, together with costs of the action, including reasonable attorneys' fees and pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

6) Permanently enjoining and restraining Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or

combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

7) Awarding Plaintiff and the Class pre- and post- judgment interest as provided by law, and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint; and

8) Granting Plaintiff and Class Members such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

DATED: April 13, 2026

By: /s/ *Kimberly A. Justice*

Kimberly A. Justice
**JUSTICE JAGHER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: (484) 243-6335
kjustice@jjlmlaw.com

Robert J. Wozniak
Samantha M. Gupta
**JUSTICE JAGHER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
rwozniak@jjlmlaw.com
sgupta@jjlmlaw.com

William G. Caldes (*pro hac vice forthcoming*)
Jeffrey J. Corrigan (*pro hac vice forthcoming*)
Jeffrey L. Spector (*pro hac vice forthcoming*)
**SPECTOR ROSEMAN & KODROFF, P.C.**
2001 Market Street, Suite 3420
Philadelphia, PA 19103
Tel: (215) 496-0300
bcaldes@srkattorneys.com

jcorrigan@srkattorneys.com
jspector@srkattorneys.com

H. Samuel Prim, III (*pro hac vice forthcoming*)
**PRIM & MENDHEIM, LLC**
P.O. Box 2147 (36302)
103 Jamestown Boulevard
Dothan, AL 36301
(334) 671-9555
samuelprim@gmail.com

***Attorneys for Plaintiff and the Proposed Class***